NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0588n.06

Nos. 15-5554/15-5626

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 31, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MICAH ISRAEL and EMMANUEL CHENAULT, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: GUY, BOGGS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Emmanuel Chenault took what he thought was a kilogram of cocaine from a co-worker and sold it to his friend, defendant Micah Israel. The "cocaine" was a cleverly disguised block of wood, and the co-worker a confidential informant. Police monitored the transaction and arrested Chenault and Israel on attempted drug-trafficking charges. Both were convicted and appeal. Finding no error requiring reversal, we affirm.

I.

In late February 2014, Christopher Jordan found himself on the wrong side of the law. His probation officer caught him with over eighty pounds of marijuana—a violation of his supervised release. Hoping to "help himself out," Jordan decided to cooperate as a confidential informant. In this regard, Jordan sparked a conversation with a co-worker, defendant Emmanuel

Chenault, who indicated he had a drug connection. After a series of conversations, which Jordan recorded at the behest of law enforcement, Jordan and Chenault came to an agreement: Jordan would front Chenault four kilograms (known as "bricks") of cocaine, which Chenault would sell to his connection, and Chenault would then reimburse Jordan $30,500 for each brick. In addition, defendant Chenault agreed to pay Jordan $2,500 as a "kick-back" for the "cocaine."

On July 1, 2014, under the watch of undercover police officers, Jordan and Chenault met in a mall parking lot. Jordan handed Chenault a bag purporting to have the four kilograms of cocaine. In reality, each brick was a wood two-by-four wrapped in tape, axle grease, and cellophane. Without checking the contents, Chenault took the four faux bricks and told Jordan he would be back in thirty to forty-five minutes with his money.

Chenault did not head directly to his buyer. Instead, he drove his car for about forty-five minutes, occasionally stopping, turning around, and heading in the opposite direction. According to the officers, Chenault was "dragging," a type of counter surveillance that individuals use to determine whether they are being followed. Chenault eventually arrived at defendant Micah Israel's house. After five to ten minutes inside, Chenault left with a white bag, which appeared to be a money bag. Chenault traveled some distance from Israel's house, at which point the police stopped and detained him. Officers seized $35,000 and three of the faux bricks from Chenault's vehicle. Chenault acknowledged that the $35,000 was his, but said the bricks were just "blocks of wood." Chenault also commented that "he made his bed and that he had to lie in it."

Meanwhile, minutes after Chenault drove away, undercover officers observed Israel pacing back and forth in his front yard. Israel was arguing with someone on the phone and, according to one police observer, "looked agitated and stressed." He then went back into his

house and quickly exited again, this time leaving in his car.  At this point, officers attempted to stop and detain Israel.  However, Israel had other plans.  He took the officers on a slow-speed car chase, evading two road blocks and eventually arriving back at his house.  During the brief escapade, he called his girlfriend, Jashae Watts, and told her to "go into the bathroom, . . . get the stuff that was in there[,] and throw it over the fence."  When Israel finally arrived back at his house, he was arrested without incident.

Later, police executed a search warrant for Israel's home.  Inside, police found digital scales with cocaine residue, plastic baggies and bottles containing known "cutting agents" (white powdery substances used to dilute cocaine base), a money counter, a firearm and ammunition, cocaine test kits, and literature on how to manufacture cocaine and marijuana.  On the other side of Israel's fence, police found one of the fake bricks of cocaine, a digital scale, and a rubber glove with grease residue.

A grand jury indicted both Chenault and Israel on one count of attempted possession with intent to distribute 500 grams or more of a mixture containing cocaine, in violation of 21 U.S.C. § 841(a) and § 846.  After defendant Israel's unsuccessful pre-trial motion to suppress and an eleventh-hour request for substitute counsel, the case proceeded to trial.  The jury found defendants guilty as charged.  The district court sentenced Chenault to 120 months in prison and Israel (who was a "career offender" under the Sentencing Guidelines) to 420 months in prison.

II.

First, we address defendant Chenault's challenge to the sufficiency of the evidence.  We review this claim de novo, assessing the evidence "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015).

A jury convicted Chenault of attempted possession of a controlled substance with intent to distribute. *See* 21 U.S.C. §§ 841(a), 846. To sustain an attempt conviction, the government must prove beyond a reasonable doubt that the defendant (1) intended to commit the proscribed criminal conduct and (2) took a "substantial step" towards commission of the offense, in this case possession of cocaine with intent to distribute. *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). In the context of attempt offenses, where the danger of convicting for mere "thoughts, desires or motives" is acute, *United States v. Pennyman*, 889 F.2d 104, 106 (6th Cir. 1989), the government must prove the defendant's intent by showing that the defendant performed acts that objectively mark his conduct as criminal in nature, *United States v. Pennell*, 737 F.2d 521, 525 (6th Cir. 1984). Put differently, "the defendant's objective conduct, taken as a whole, must unequivocally corroborate the required subjective intent to purchase or sell actual narcotics." *Id.* Chenault argues that the government's evidence failed to meet this standard and otherwise failed to prove he believed the substance in question was cocaine. We disagree.

Chenault's and Jordan's agreement to exchange $30,500 per brick and Chenault's subsequent sale of one of the faux bricks to Israel for $35,000 objectively marked Chenault's conduct as criminal in nature. No reasonable person would agree to pay $30,500 for a "brick," much less charge another person $35,000 for the item, unless they believed the substance inside was cocaine. *See id.* (holding that purchase price reflecting market value of controlled substance an objective marker of criminal conduct). Chenault responds that he told officers he had only "blocks of wood" in his car. This, he says, shows that he knew the bricks were fake and that he was just trying to "rip . . . off" Israel. That is one inference the jury could draw from Chenault's statement. Another reasonable inference is that Chenault discovered the "cocaine" was fake only after Israel called him complaining that the brick was wood. This reasonable inference finds

support in the officer's observation of Israel "on the phone having an argument" shortly after Chenault left, and the fact that Israel cut open his brick, but Chenault did not inspect the other three. The jury was free to draw this reasonable inference, and it is not our station to disturb its decision. *Mack*, 808 F.3d at 1080. In addition, the government also presented recorded conversations between Chenault and Jordan about setting up a cocaine deal, Chenault's suspicious driving tactics following the exchange, and his admissions to police that the $35,000 belonged to him. "[T]aken as a whole," this conduct "unequivocally corroborate[s] the required subjective intent to purchase or sell actual narcotics." *Pennell*, 737 F.2d at 525.

Chenault's remaining arguments to the contrary are unpersuasive. It is immaterial that money never exchanged hands between Chenault and Jordan. Chenault agreed to pay $30,500 per kilogram and was on his way toward fulfilling that promise by charging Israel $35,000 for one kilogram. The only reason Chenault was unable to hold up his end of the bargain was because police arrested him. *See Pennyman*, 889 F.2d at 107 ("[C]ollateral acts by another person that may have prevented defendant from consummating the deal to purchase cocaine do not negate his subjective intent to possess."). It is also immaterial that Chenault never insisted on testing the kilograms, *cf. Pennell*, 737 F.2d at 525, as it was apparently his modus operandi as "a middle guy" not to "touch them."

The government presented sufficient evidence to prove beyond a reasonable doubt that Chenault intended to possess and distribute cocaine and that he took a substantial step toward doing so. *Bilderbeck*, 163 F.3d at 975. We therefore affirm his conviction.

## III.

We turn next to Israel's claims on appeal. He argues that the district court committed four errors: first, in denying his motion for substitute counsel; second, in failing to sever his trial

from that of his codefendant; third, in denying his request for a "*Franks*" hearing; and fourth, in imposing a substantively unreasonable 420-month prison sentence. We address each in turn.

A.

Israel asserts that the district court erred in denying his request for substitute counsel. We review such decisions for an abuse of discretion. *United States v. Mack*, 258 F.3d 548, 555–56 (6th Cir. 2001).

Two weeks before trial, Israel wrote a letter requesting new counsel. He also renewed his request on the first day of trial. On both occasions, defendant complained that his trial counsel (his second appointed counsel, after the first agreed to withdraw at Israel's request) failed to give him a complete copy of a discovery document and altered the appearance of several others. The district judge responded that he reviewed the documents in the record and assured defendant that "[t]here's nothing that's been altered or changed in any way." Israel's counsel confirmed this. The district court denied defendant's motion for new counsel, observing, "If there is any [breakdown] in communications, it is solely the fault of Mr. Israel. It does appear that he has not been reasonable, either with his prior counsel or with his current counsel." The district court gave Israel the option of representing himself or proceeding with his current counsel. Israel elected to proceed with counsel.

In evaluating the district court's decision, we generally consider four factors:

(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Id*. at 556. On balance, the relevant factors support the district court's exercise of discretion.

*Timeliness*. This factor does not favor defendant. Defendant moved for new counsel based on the allegation that his trial counsel altered documents pertaining to the search warrant executed at his home. Yet, the record indicates that Israel had the documents in question for over a month before he first complained about counsel's alleged fabrication (*see* ID 1187–88, 1192, 1236 (defense counsel discussing defendant's issues with the search warrant affidavit)). By the time Israel raised his concerns, counsel had five weeks earlier filed a motion to suppress based on the documents in question. Then—not suddenly two weeks before trial—was the appropriate time to raise concerns about the authenticity of record documents. *See United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (finding motion for substitute counsel two weeks before trial untimely); *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008) (per curiam) (finding the defendant's request untimely, in part, because he failed to raise the issue earlier, despite "several chances" to do so). We are not persuaded defendant acted diligently in bringing his concerns to the district court's attention.

*Complete Breakdown of Communication*. Defendant's unsubstantiated allegation of fabricating evidence is insufficient to demonstrate his relationship with counsel "had so deteriorated that it resulted in a total lack of communication preventing an adequate defense." *United States v. Sullivan*, 431 F.3d 976, 981 (6th Cir. 2005) (internal quotation marks omitted). Indeed, despite Israel's accusation, counsel continued to meet with him in the lead-up to trial, a testament to counsel's commitment to his representation of defendant. *See United States v. Jennings*, 83 F.3d 145, 149 (6th Cir. 1996) (finding no communication breakdown because counsel subsequently met with the defendant). Israel also points to the following exchange, which he describes as "hostile" and "antagonizing," as further evidence that there was a complete breakdown in the attorney-client relationship:

> [THE COURT:]  So your choices are Mr. Hicks represents you here today, or you would represent yourself.  And I've warned you of the dangers and perils if you do represent yourself.
>
> What's your choice?
>
> DEFENDANT ISRAEL:  I don't feel comfortable with —
>
> MR. HICKS:  That's not what he's asking.  That's why we have decisions. You're trying to come up with a third option, and Judge has given you two.

When it comes to this kind of argument, however, appellate courts are at a distinct disadvantage. From its on-the-ground perspective, the district court had ample opportunity to evaluate this exchange and the overall relationship between Israel and his trial counsel.  Its assessment: "Some defendants just can't seem to get along with their attorney.  No fault of the attorney.  And in this particular case, it does appear to be entirely [Israel's] responsibility of any problems that [he's] had with Mr. Hicks."  Nothing in the cited passage gives us reason to second-guess that assessment.  And given its finding that Israel was to blame for any friction in the attorney-client relationship, the district court had ample basis to reject his request for substitute counsel.  *See United States v. Vasquez*, 560 F.3d 461, 468 (6th Cir. 2009) (holding that the breakdown-in-communication factor did not support granting substitute counsel when "any lack of communication" was due to the defendant's "refusal to cooperate").

*District Court's Inquiry*.  Defendant argues that the district court's inquiry into his request for substitute counsel was legally deficient.  But an in-depth colloquy is unnecessary when the basis for the request has only surface appeal.  Nor was it necessary, as Israel contends, for the district court to inquire into other areas of trial counsel's performance.[1]  "At a

---

[1] At various points in his brief on appeal, Israel contends that his trial counsel provided ineffective assistance of counsel, while conceding that, as a general rule, this court does not address such claims on direct appeal.  *See United States v. Detloff*, 794 F.3d 588, 594 (6th Cir.

minimum[,] the defendant must show his hand," *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) (internal quotation marks omitted), which includes specifying the basis (or bases) for the request. Israel's sole complaint below was allegedly doctored documents, which the district court adequately resolved by assuring him no documents were altered. Having "determine[d] the reasons for defendant's dissatisfaction with his current counsel," and corrected the mistaken basis for his request, the district court satisfied its duty to inquire. *Id.* at 1130.

*Public's Interest.* This final factor weighs heavily in favor of the district court's decision. The public's interest in the efficient administration of justice is disserved by permitting continuances based on frivolous complaints about attorney performance. *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004). Furthermore, granting Israel's request would "almost certainly [have] necessitate[d] a last-minute continuance," a consequence that requires we give the district court's decision "extraordinary deference." *Vasquez*, 560 F.3d at 468. And, since Israel's trial was joined with his co-defendant's, granting a last-minute continuance would have been especially costly, both to the administration of justice generally and to Chenault's constitutional interest in a speedy trial. *See United States v. Amawi*, 695 F.3d 457, 481 (6th Cir. 2012).

In light of the deference afforded the district court's exercise of discretion, and the absence of any facts militating in defendant's favor, we affirm the district court's denial of Israel's motion for substitute counsel.

---

2015). We adhere to that general rule here, leaving Israel free to raise his claims in a post-conviction proceeding. *Id*. at 594–95.

B.

Israel next argues that the district court erred in failing to sever his trial from Chenault's. Because he failed to bring this issue to the district court's attention, we review for plain error. *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015).

Rule 14 permits a district court to sever a joint trial if it "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). "Prejudice" in this context means "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993).

Israel contends that severance was required because Chenault's trial counsel made three statements that unfairly tainted the jury's perception of him: first, he contended in his opening statement that "[Israel] is clearly a drug dealer. There's all kind of stuff in his – in his house. There's actual cocaine residue. There are cutting agents"; second, he confirmed with Jordan that "what [Chenault] did with these blocks of wood was he sold one to Micah Israel"; and third, during that same line of questioning, he reiterated that Chenault "gave one of these fake keys to Micah Israel and got $35,000."

These statements fall far short of the type of "compelling, specific, and actual prejudice" required to justify a severance. *United States v. Ross*, 703 F.3d 856, 885 (6th Cir. 2012). First, the statements at issue—counsel's opening statement and questions to witnesses—"do not provide an evidentiary basis for severance" because they are not evidence. *Id*. Second, and more fundamentally, "[h]ostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992). Chenault's counsel's statements fall into

this category of non-prejudicial conduct. Israel does not identify a specific trial right compromised by Chenault's counsel's statements, nor does he contend that the statements unfairly conflated the evidence, leaving the jury unable to separate the proofs. *Soto*, 794 F.3d at 657. Israel has therefore not demonstrated the type of prejudice necessary to warrant severance under Rule 14. *See Zafiro*, 506 U.S. at 539.[2]

C.

Next, Israel argues that the district court erred in denying his mid-trial motion for a "*Franks*" hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) (entitling a defendant to a hearing if he makes "a substantial preliminary showing" that a warrant affiant "knowingly and intentionally, or with reckless disregard for the truth," included a false statement that was "necessary to the finding of probable cause"). In his affidavit in support of a warrant to search Israel's residence, Detective King stated that Detective Page "observed Chenault coming out of [Israel's] house carrying a white bag" and "believed money to be in the bag." At trial, Detective Page testified that he "believe[d] it *could* be money in the bag." (Emphasis added.) In the wake of Detective Page's testimony, Israel moved for a *Franks* hearing, contending that the difference between "believe" and "could be" was a material discrepancy affecting probable cause. The district court denied the motion as "a matter of semantics."

---

[2]Israel asidely asserts that counsel's statements violated the spirit of *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits admission of inculpatory statements by a co-defendant without the opportunity for cross-examination. *See United States v. Cope*, 312 F.3d 757, 780 (6th Cir. 2002) (citing *Bruton*, 391 U.S. at 137). However, defendant concedes that counsel's statements were "not technically a *Bruton* violation" under prevailing law, and any error on this basis would not have been "plain." *United States v. Olano*, 507 U.S. 725, 734 (1993) (defining "plain" error as "clear under current law"); *see also United States v. Crowe*, 614 F. App'x 303, 307 (6th Cir. 2015) (holding that inculpatory statements by co-defendant's counsel "do[] not fall within the scope of the *Bruton* principle").

This claim is without merit for several reasons. Israel has not alleged that Detective King "knowingly and intentionally" falsified the statement in question. *Id.* at 155; *see United States v. Brown*, 732 F.3d 569, 575 (6th Cir. 2013) (finding no substantial preliminary showing where defendant "proffered no evidence" that an allegedly false statement was made intentionally or with reckless disregard for the truth). He merely argues that the discrepancy between Detective Page's statements is a material one affecting the probable cause calculus. But even this contention is unconvincing, for it assumes that Detective Page's observation of Chenault leaving Israel's home was the only information connecting Chenault's drug-trafficking activity to Israel's residence. It is not. The affidavit also informed the issuing magistrate: one, that officers followed and detained Chenault after he left Israel's residence, finding $35,000 in a white bag, as well as three of the four faux bricks of cocaine; two, that Watts, Israel's live-in girlfriend, told officers that Israel instructed her to throw certain items from his bathroom into the neighbor's yard; and three, that officers located one of the faux cocaine bricks with a small cut in it, a digital scale, and a rubber glove with grease residue on the other side of Israel's fence. Even redacting Detective Page's observation, these facts were more than sufficient to "'provide[] the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found at' the stated location." *Brown*, 732 F.3d at 575 (quoting *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008)). Israel was not entitled to a *Franks* hearing.

### D.

Israel's final argument challenges the substantive reasonableness of his thirty-five-year prison sentence. This court reviews the reasonableness of criminal sentences under a deferential abuse-of-discretion standard. *United States v. Taylor*, 800 F.3d 701, 712 (6th Cir. 2015). A sentence may be substantively unreasonable if the district court selects it arbitrarily or fails to

consider, or gives an unreasonable amount of weight to, any relevant § 3553(a) factor. *United States v. Wendlandt*, 714 F.3d 388, 397 (6th Cir. 2013). Because defendant's 420-month sentence was within the Guidelines range (360 months to life), a rebuttable presumption of substantive reasonableness applies to the district court's sentence. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).

Israel argues his sentence is substantively unreasonable because the district court selected it arbitrarily. According to Israel, the district court summarily concluded that a thirty-year prison sentence would not deter defendant, but a thirty-five-year term would. In a related vein, Israel argues that the district court relied on generalized theories in James Wilson's *Thinking About Crime* to conclude, without further explanation, that defendant could not be deterred from crime. A review of the sentencing transcript reveals that the district court's explanation in both respects was quite reasoned.

First, the district court never indicated that a thirty-year sentence would not deter defendant. After posing the question rhetorically, the district court answered, "I don't know[.]" The district court then explained that, regardless, a thirty-five-year sentence would better protect the public than a thirty-year one. Moments earlier, the district court invoked *Thinking About Crime* for the proposition that, for certain offenders undeterred by lengthy periods of incarceration, protection of the public should be a more important consideration than specific deterrence in selecting appropriate punishment. He then tied that to defendant's case, explaining that "[Israel] really has not learned anything [from] these past convictions because he is ready, willing and able to engage in drug trafficking at the earliest opportunity it would appear. . . . When we talk about issues of deterrence, I do have questions about whether any term will deter the defendant. He would rather, it would appear, engage in drug trafficking activities than

legitimate business activities." The district court reasoned that, given Israel's resistance to specific deterrence, protection of the public took on greater significance in his case. Our advisory guidelines system authorizes district courts (not the Sentencing Commission or this court) to weigh the various sentencing factors to arrive at an appropriate sentence in a given case. *See Gall v. United States*, 552 U.S. 38, 51–52 (2007). Far from being arbitrary, the foregoing discussion reflects precisely the type of individualized, fine-tuned balancing of § 3553 factors required of district courts. *See United States v. Adkins*, 729 F.3d 559, 571 (6th Cir. 2013) (stating that the manner in which the district court chose to balance those factors is beyond the scope of our review).

Israel also argues his sentence is substantively unreasonable because the district court based its decision on an impermissible factor.[3] He contends that the district court selected a thirty-five-year sentence instead of a thirty-year sentence to compensate for "lenient" punishment he received for previous drug-trafficking offenses. However, Israel offers no authority for the proposition that prior punishment is an impermissible factor. *Cf. United States v. Espericueta-Perez*, 528 F. App'x 572, 578 (6th Cir. 2013) (observing that the defendant failed to cite any authority to support his contention that a district court errs by considering "a prior 'lenient' state court sentence"). In fact, the opposite is true. Section 4A1.3 of the Sentencing Guidelines authorizes district courts to upwardly depart if prior lenient punishment or lack of punishment has proved unsuccessful and recidivism is likely. *See* U.S.S.G. § 4A1.3, comment.

---

[3]This court recently held that an "impermissible factor" challenge "is more properly considered a procedural, not substantive, error." *United States v. Cabrera*, 811 F.3d 801, 809 (6th Cir. 2016). As a consequence, such challenges are reviewed only for plain error if defendants do not raise them in district court. *United States v. Simmons*, 587 F.3d 348, 358 & n.6 (6th Cir. 2009). We do not hold Israel to the plain error standard because he did not have the benefit of *Cabrera* at the time of his sentencing and, in any event, his argument fails on the merits.

(backg'd) (explaining that an upward departure is warranted for defendant "who had received what might now be considered extremely lenient treatment in the past"); *see also United States v. Pluta*, 144 F.3d 968, 980 (6th Cir. 1998) (affirming upward departure based, in part, on prior lenient sentences). A factor is not "impermissible" if it is explicitly condoned by the Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(5) (requiring district courts to take into consideration "any pertinent policy statement" issued by the Sentencing Commission regarding application of the Guidelines); *cf. United States v. Christman*, 607 F.3d 1110, 1118–19 (6th Cir. 2010) (holding that the district court abused its discretion in selecting a sentence based on factors explicitly discouraged by Sentencing Guidelines). The district court did not impose a substantively unreasonable sentence.

IV.

For the foregoing reasons, we affirm defendants' convictions and sentences.